WILLINGHAM *vs.* HOOVEN, OWENS, RENTSCHLER & COMPANY.

1. In a trover case, the plaintiffs have a right to elect whether they will accept an alternative verdict for the property or its value, or whether they will demand a verdict for the damages alone, or for the property alone and its hire, if any ; and it is the duty of the court to instruct the jury to render a verdict in accordance with such election. That in such a case the court stated that he would allow no other verdict than one for damages, and thereupon the plaintiffs in trover consented to this direction and adopted it as their election, furnished no ground for exception by the adverse party. This was the legal effect of what transpired in this case.

2. Where an agreement related to personal property and the application of skill and personal labor to it, in order to make it conform to the uses intended by the parties, and where the complainant had the property in possession, although he did not have title to it, this did not furnish a proper case for a decree for specific performance.

(*a.*) Neither a court of equity nor any other court has power to compel a party to perform personal service for another, which he has contracted to perform, but is unwilling to render. A court of equity has no power to enforce such a decree, especially against non-resident defendants.

(*b.*) In consequence of a failure of the defendants to perform their contract, the complainant could have filed his bill for its recission and to recover damages for its breach, but he could not have repudiated the contract and at the same time retained possession of the property. When the vendors elected to abandon the contract and brought trover for the property, the vendee could only enjoin the action, so as to keep the property in *statu quo*, to answer whatever either party might recover on the final hearing of the suit.

(*c.*) A money verdict for the plaintiffs in trover (defendants in the equity case) did not dispossess the other party of the property, but fixed a lien on it superior to all other outstanding liens against the holder.

3. Where the purchaser of a saw-mill and outfit sought to recover damages against the vendors thereof, resulting from the fact that the property received was inferior to that for which he bargained, losses sustained by the purchaser from abandoning planting operations in which he was engaged and going into the milling business, improvements made in order to carry on such business, alleged losses of profits by reason of having received an inferior outfit, additional purchases of timber, stock, vehicles, etc., to run a mill of the capacity of that bargained for, and personal services of himself and assistant while he was running the mill, or until its capacity had been fully tested, did not form elements of damage which could be recovered. Such damages were too remote and contingent, and evidence concerning them was properly rejected.

(*a.*) The general rule is that in an action for the breach of a contract by delivering goods of a quality inferior to that contracted for, the proper measure of damages is the difference between the value of the goods of the quality contracted for at the time of the delivery, and the value of the goods then actually delivered, or their value as ascertained by a re-sale within a reasonable time.

(*b.*) The charge was at least as favorable to the complainant as he could expect, and the defendants have not excepted.

October 2, 1884.

Trover. Verdict. Practice in Superior Court. Election. Specific Performance. Equity. Damages. Contracts. Vendor and Purchaser. Before Judge BOWER. Dougherty Superior Court. April Term, 1884

Reported in the decision.

D. H. POPE, for plaintiff in error.

G. J. WRIGHT; C. B. WOOTEN; L. ARNHEIM, for defendants.

HALL, Justice.

Willingham filed a bill against Hooven, Owens, Rentschler & Company, in which he alleged that, on the 16th day of August, they contracted in writing to furnish him a steam saw-mill outfit, complete, all first-class, the boiler to be constructed to burn all the sawdust necessary to run

it, all to be of the very best workmanship and material, and to be equal to the capacity of 30,000 feet of inch lumber per day, with proper management. In case of default in workmanship or material, the defendants were to make the same good without extra charge, and should it not perform as well as customary for machinery of like size and proportions, Willingham was to give defendants reasonable notice and a chance to make it perform in a proper manner, the same to be ready for delivery at Hamilton, Ohio, on or before 22d of September, 1881; consideration to be $3,565, one-third due in sixty days from the erection of said machinery, one-third eight months after, and one-third twelve months, with eight per cent interest on all, for which Willingham was to give his negotiable notes, payable at Central Railroad Bank, with exchange, the title to remain in defendants until paid for. The above rig fully guaranteed to perform all the above specifications to the satisfaction of said Willingham.

The mill and outfit failed to come to time, and Willingham went on to Ohio November 1, 1881, and defendants wrote the following, which Willingham then and there signed:

" In consideration of the shipment to me of my engine and saw-mill outfit, as per contract of August 16, 1881, I hereby agree, immediately on my return home, to duly execute my notes, negotiable, and payable to the order of Hooven, Owens, Rentschler & Company, and deposit them, subject to their order, with the Central Railroad Bank at Albany, Georgia, the same to be delivered to Hooven, Owens, Rentschler & Company, as soon as the saw-mill outfit is set up and works satisfactorily according to contract; the notes to hold the outfit as the property of Hooven, Owens, Rentschler & Company. until all is paid; the said outfit to be shipped at once."

That notes were then drawn by defendants, signed by complainant and deposited in pursuance of the contract; that complainant, having refused, for reasons satisfactory to himself, to pay for the outfit, the defendants, on the 8th of September, 1882, instituted their action of trover and bail against him for the recovery of the same; that

he gave the bail as required; that, on 1st of December, 1881, he received from defendants an outfit, which they shipped to comply with said contract; that he had little or no skill in the business, while defendants were experts. He wanted to enter into the manufacture of yellow pine lumber, and it cost but little more to cut 30,000 feet per day than 10,000 feet, and the profits would be proportionately larger; that he was especially careful to guard his interests in the contracts; that they assured him a 30,000 foot mill, inch lumber, should be furnished; in order to make himself safe, he contracted as set out; that, relying on defendants, he spent large sums of money and 'contracted large debts, to-wit, $10,000 or other large sum; that he warned defendants to be careful to comply with their contracts, and they assured him they would; that he hired skilled assistance, put said outfit in good and proper position, supplied it with all needful help and labor, good logs, and tested its full capacity, and it would not turn out over 7,000 to 8,000 feet inch lumber per day; that he at once notified defendants of its failure, and one of their members came down, and said he would make it comply with said contract, and cut 30,000 feet inch boards per day. After seeing the mill, he admitted it would not, and that he would go home and send the machinery to make it do so. Afterwards defendants wanted to sell said outfit to complainant at a greatly reduced price, but he demanded that the contract be complied with, and defendants declined to do so, saying it could not be done without loss to them. The boiler is not constructed so as to burn sawdust to run the mill, which would save the expense of removing said dust and furnishing wood, at the yearly expense of $500.

To run a 30,000 foot mill would cost about $220 per day, and its proceeds would be worth about $365. A 5,000 foot mill would cost about $50 dollars per day, and its income would be about $62.50. So he avers he is injured and damaged in the sum of $20,000; that, although de-

fendants reserved title in said property, by their failure to comply with their contract, they have injured and damaged him; that they have commenced their action of trover and bail to recover the same without accounting to him for said damage; all of which resulted from their fraudulent conduct. Prayer for injunction, and that a decree be entered requiring said defendants to specifically perform their contract, and account for all the damage resulting from their failure to do so; that, on failure of defendants to perform said contract, a round sum be decreed, and the present outfit be sold therefor. Such other relief as the facts of his case would warrant was prayed. Discovery was waived.

Complainant amended his bill, alleging that at and before he commenced negotiations for the purchase of said mill, he was engaged in planting, was well equipped with plantations, stock supplies, farming tools and implements necessary to carry on said business successfully, and he had made money therein. Lumber was commanding a good price, $16 per thousand, and he believed, with sawmill outfits at a reasonable price, there was more profit in lumber than in farming. Defendants were experts; he was not, and relied on them; told them fully where the mill was to go, and that it was to cut yellow pine; that he wanted a 30,000 feet inch boards per day mill; so told them, and they so contracted with him; that on the faith of said contract, he broke up his planting interest, leased the right to cut logs on 15,000 acres land at $125 per month; that he was skilled and successful in planting, and the defendants falsely, fraudulently and knowingly, and with a view to deceive and defraud him, made the contract aforesaid, and at the price therein stated, when, in truth and in fact, such a mill was worth from $12,000 to $15,-000, which was well known to defendants and unknown to him; but for their false and fraudulent representations, he would not have given up his planting and gone into the lumber business, by means of which he is damaged

$10,000; that, for the same reasons, he built a large mill-house, worth $3,000, out-houses, fences, wells, water conveniences, and other improvements for running such a mill, that cost $2,500; that by their false promises to make the mill cut 30,000 feet, as per contract, he was induced to continue the test for six months before final refusal, when lumber was high, $16 per thousand, and was thus damaged $3,000; for about the time the test ended, lumber fell to where there was little or no profit in it, and he lost all the good time to work such a mill in; that his damages are of so many kinds, and of such complicated nature, all resulting from the frauds of defendants, that they cannot be correctly and definitely ascertained in money, to be adequate compensation for the non-performance of the contract made; that he is now, and has been ready and willing, and offers to comply with his part of the contract, and prays a decree requiring defendants to specifically perform their contract, in letter and spirit, which it is in their power to do; and that such damage be decreed him as he will prove on the trial; and that the action of trover be enjoined until they do comply with said contract, and all other relief, etc., be granted.

The defendants answered, admitting they entered into the contract set out, and alleging that they complied strictly and fully with it, and that they did all required of them thereby; state they had no knowledge that Willingham deposited their notes as claimed, and deny the averments; and deny that there was any contract that they were not to have notes until Willingham was satisfied, etc. Admit they are skilled in saw-mill business, and do not know whether Willingham is or not, but say he dictated size and style of mill, and claimed to know what he wanted. Aver the mill sent will cut 30,000 feet inch lumber per day, if properly handled, in poplar, or any other wood ordinarily meant by mill experts, workers or by buyers, and deny all contrary averments. Deny they assured him the mill would cut 30,000 feet yellow pine, or that he spent any

sum on any assurance, except the contract; and aver that, with the idleness, mismanagement, ignorance and incapacity, which characterized the use of said mill all the time, it would not cut it; that he admitted that he did not know how to run it properly. Deny that he hired skilled assistants and put the outfit in good shape, or that he supplied it with all needful help or good timber. Admit he may have done all he knows. Deny that the mill only cuts 7,000 or 8,000 feet of inch lumber per day, but run with poor timber and bad management, it cut 17,000 feet per day. Deny that any member of this firm ever admitted the mill did not come up to contract, or that he would go home and send machinery to make it better, or that they would sell at reduced price, except as a compromise, he being nearly insolvent. Aver the boiler will consume sawdust, and deny the cost of running mills as set out in the bill, and deny all damage, and state he told them he was making $60 per day above all expenses. Deny that any complaint was made of the mill during the time it should have been made under the contract, and say his present complaint is to delay, defraud and cheat them, and for no other purpose.

The trover and bail suit was enjoined.

On the trial of the issues thus formed, much testimony of a conflicting character was offered by the opposing parties, and after being charged by the court, the jury returned a verdict in favor of the defendants for $2,800, and the complainant made a motion for a new trial, which was refused. The following are the grounds of the motion:

(1.) Because the court erred in refusing to allow complainant to prove by himself, " that prior to entering into the contract with defendants, he was engaged in farming, and was successful therein ; had made a living for himself and family, and clear money besides; that lumber was at $16 per thousand; that he thought, if he could get a mill, such as is set out in the contract, and at the price therein stated, he could make more money in the lumber business

than at farming; that he was inexperienced in the value of such things; defendants were experts therein; that since he made the contract, and had gone into the business, he had learned from one of defendants that such a mill would cost from $10,000 to $15,000; that, under said contract, he had changed the plan of carrying on his planting interest by selling it out at a sacrifice, the amount of which he could not really tell; that he had tenanted out his lands, and they were not kept up, and he could not tell his damage in that respect; that he made a lease of the right to cut timber for five years, at $125 per month, of 15,000 acres land; had built on the leased lands a mill house 220 feet long, two stories high, worth $3,000, outhouses, water supply, tenant-houses, and other improvements thereon; bought log carts, mules, harness, and other material to run such a mill, worth $2,500; that the expenses of running a 30,000 feet inch lumber mill were but little more than a 10,000 one, and the profits enormously more; that he would not have made said lease, or incurred the other expenses on said leased lands, or broke up his planting interest, except for the contract and promise of defendants that they would furnish him a mill such as contracted for, and at the price stated; that they deceived him, and induced him to quit his farms and go into lumber, and make the improvements and lease of such lands by false statements as to the price of such a mill; that if they had told him the truth, as to the cost of such a mill, he would not have quit planting, nor gone into the business of lumber, and when he relied on them for the truth in such matters, and had incurred all this expense without profit; or to allow the plaintiff to show by himself, his son, W. B., or C. U. Barton, the expense of running a mill of the capacity of one sent, and one of a capacity of 30,-000 feet inch lumber per day, and the profits made by each kind, and to show that while a 10,000 feet mill would barely make expenses, a 30,000 feet mill would make a good profit, and to show what the profit would be, the

actual cost of each improvement made on the leased lands, and the personal property bought to run such a mill."

(2.) The court erred in refusing to allow complainant to prove by the witnesses aforesaid, " the excess of profits he could have made with a mill of 30,000 feet inch boards per day capacity, up to the time the test of the one sent ended, when he could make but little or no profit on one of the capacity sent."·

(3.) Because the court erred in charging the jury : " Under this contract and evidence, the seller is not entitled to recover the machinery in kind, nor hire for the same."

(4.) Also : " You will construe the whole contract and evidence together, and if you believe from the evidence that the machinery in the original contract was the kind delivered, in every respect, as to material, workmanship and capacity, you should find for the sellers the agreed price, without making any deductions."

(5.) Also : " If you believe that, after the sellers added other articles of machinery, it then was up to the contract in every respect, you should find for the sellers the agreed price of the original machinery named in the contract, without any deduction."

(6.) Also : " If you believe from the evidence that the machinery was not up to the contract, or guarantee, in quality or capacity, and there has been no loss to buyer in making the test, you should find for the sellers the market value, whatever that has been shown to be in the evidence, with interest, even if that should be as much as the agreed price or less."

(7.) Also : " If you believe from the evidence that the machinery was not up to the guarantee and contract, in any respect, either in defective material, workmanship or capacity, and that the buyer, in testing the machinery under the contract, incurred expense, damage or cost, as I have heretofore charged you, you will first see what is the difference between the agreed value of the machinery and its real value at the time of delivery, or at the time of the

v 74-16

completion of the test, according to what the evidence may show was such value, and you will fix this market value as the amount subject to be recovered by the sellers, even if such market value is equal to the agreed price, and then deduct from this amount any damage you may find under the rules I have given you, and find for the sellers the balance with interest." "Or, as before stated, if the deductions exceed the market value of machinery, you would find for Willingham the balance in his favor, as well as the machinery." [The last clause from "or" down not excepted to, but put in by the judge.]

(8.) Also: "It is incumbent on sellers to prove the agreed price under the contract. This may be done by the contract, and the other evidence together with the contract. It is then incumbent on the buyer to show the inferiority of the machinery, its defects and its less value, and how much less than the agreed price by reason of the deficiencies; and it is incumbent on him to prove to your satisfaction any special damage, loss or cost incurred in the test of the machinery under the contract, before he could have the same deducted, or reduce the amount shown to be due to the sellers."

(9.) Also: "Was the mill and outfit, in original contract, such as it was guaranteed to be in every respect? If so, the trover suit should not be enjoined; the sellers should recover the agreed value of the original machinery; and, if the second lot of machinery was all right, the value of that also, as well as the legal interest on the amount from the time the notes fell due, with a special lien on the machinery for the amount."

(10.) Also: "If the mill and outfit, in the original contract, was not such as contracted for, in any material respect, without the addition of the second machinery, but with that was up, in every respect, to the contract and guarantee, the seller should recover the agreed value of the original machinery, with legal interest, without adding anything for the second lot."

(11.) Also: " If the machinery, altogether, did not come up to contract or guarantee, in any material respect, either in being in part or in whole defective in any respect, or in wanting the requisite capacity in any of its parts, or in the whole, you should look to the evidence and see what these defects or want of capacity are, as well as to the proved market value of the machinery actually delivered,. so as to determine the real market value of the whole machinery at the time of delivery, or if it was worth less by reason of the test, its value at the time the test was completed, and deduct from the agreed price of the first lot of it the difference between such agreed price and the real value of the machinery at the time it was delivered, or if it was of less value at the time the test was completed, by reason of the test, without fault on the part of the purchaser, the value at the time the test was completed. You will assess, from the evidence, any loss or damage or expense that the purchaser necessarily incurred in making the test contemplated under the evidence and contract, such as any losses in running the mill for the time agreed upon in making the test, which is sixty days, or a longer time, if the evidence shows you that a longer time was necessary to make such test, and also any other necessary expense outside the regular running of the mill, that was incurred by the purchaser as necessary in making the test, if any such was incurred. You will also assess, from the evidence, the amount you think should be allowed for the necessary personal attention the purchaser gave the matter during the necessary period of making the test, under the evidence, if the evidence shows you Mr. Willingham gave his personal attention and services to the mill during the necessary period of the test, and that attention was necessary, under the evidence, to make the test, and such attention and service was given for the purpose of making the test, he would be entitled to reasonable compensation. for that attention and service during the time it was necessary for him to make the test of the machinery. whether

the mill made a profit or not, unless the evidence shows you that such attention and service on his part was not for the purpose of making the test, but merely in the general management of the mill. But the fact that he gave general attention to the mill at the time it was necessary to make the test, would not prevent this allowance; and any other special damage, if any has been proved, incurred by the purchaser in making said test, and deduct all these amounts also from the agreed price of the original machinery, and find for the sellers the balance with interest; and if the amount, in aggregate of all the deductions, would amount to more than the market price of the original machinery purchased under the contract, you should, in that event, enjoin the seller's action of trover, and also find for the purchaser, Willingham, the difference between the amount of said deduction and the said market price, and that the machinery also belonged to Willingham."

(12.) Also : " In computing and estimating these damages, expenses and losses of Willingham, you will not take into consideration such damages, loss or expense as he might have incurred from the following sources: in abandoning or changing his farming operations, and in leasing lands for the purpose of going into the saw-mill business, cost of building houses, water-works, and of the appurtenances of the saw-mill business. These would not be proper subjects of damages, loss or cost to be estimated in Willingham's favor, or to be set off against the sellers' demand."

(13.) Also: " But you will from the evidence determine whether the running of the mill through the necessary period of test was with a loss or profit. If with a loss, you will estimate that loss, and allow it to Willingham against this debt. If the mill was not run with a loss during the period, or if it was run with a profit, you would give that branch of the case no further consideration. You will then determine from the evidence what, if any, special

damage, loss or expense, outside of the regular running of the mill, and connected necessarily with the test, was incurred by Willingham, and allow him that as a deduction or set-off against the debt. You will then determine what personal attention and service Willingham necessarily gave during and connected with the test, and fix the value of these services, under the evidence, and allow him that as a deduction or set-off against the defendants. But if his services and attention at the mill were not for the purpose of making the test, merely in general management, you will not allow for the services." "The fact that he gave his services and attention, at the time the test was going on, to the general management of the mill also, would not prevent this allowance." [The last section not excepted to, but put in by the judge.] "These items, together with the amount of difference between the agreed price and the real value of the machinery as heretofore stated, would be the items of deduction, set-off or recovery in favor of Willingham, as the case may be under the evidence. If these amounts are less than the sellers' proved debt, you would find for the sellers the balance, with a special lien on the machinery. If the amount in favor of Willingham, under the rules given, are more than the sellers' debt, you would enjoin the sellers' action of trover, and find for Willingham the machinery as well as the balance alluded to."

(14.) Also: "Under the pleading and evidence in this case, this is not a case of specific performance, and therefore you will not consider it in that view."

(15.) Also, in referring to charge, as requested in writing: "That if the seller made a contract to furnish a mill and outfit that would cut 30,000 feet of inch boards per day, and was to get the buyer's notes when he did so, and was to retain title to secure the notes, the seller cannot maintain his action of trover until he does comply with his contract, or the buyer relieves him therefrom."

(16.) Also, in failing to give in charge the law of specific

performance, this being a case in which it could be decreed.

(17.) Also, in failing to charge, that if the complainant had fulfilled his contract as far as gone, and was willing and ready to continue to do so, and the defendants had failed to fulfill or comply with their part of it, the jury should find enjoining the action of trover until they did specifically perform their part of the contract.

The defendants in this case, the plaintiffs in the trover case, did not elect to go for an alternative verdict; but during their concluding argument, the court, on its own motion, notified them, while they were urging the jury to give them the property and hire, that they could not get such a verdict, but it must be a money verdict, to which defendants' counsel assented, and to all which complainant excepted.

Notwithstanding the numerous errors assigned in the motion for a new trial, to the rejection of evidence, the refusals of the court to charge as requested by complainant's solicitor, and to the charge of the court as given, and the direction as to the character of the verdict, in case one was found for the defendants, the material questions for determination may be reduced to three.

(1.) Was this a proper case for the specific execution of the contract in question?

(2.) Was a correct rule for measuring the damages given in charge to the jury, and consequently was the court right in rejecting testimony offered under a different rule than that which it laid down?

(3.) Was there error in directing a money verdict for the defendants in case the jury should find for them?

1. We will first deal with the last of these questions. Were the defendants entitled to recover in their action of trover (for this is the legal effect of the verdict of the jury in this case)? If so, they had the right to say upon the trial, whether they would accept an alternative verdict for the property or its value, or whether they would demand a verdict for the damages alone, or for the property alone

and its hire, if any; and when they had thus elected, it was the duty of the court to instruct the jury to render the verdict in accordance with their election. Code, §3564. True the court stated in this case that he would allow no other than a verdict for the damages, but the defendants consented to this direction and adopted it as their election; the complainant was not injured by it; none of his rights were sacrificed, unless the court erred in his decision as to the relief specially prayed for by the bill; he had no power to dictate what election the defendants should make.

2. We are satisfied that this was not a proper case for the specific execution of a contract. The agreement related to personal property, and the application of skill and personal labor to it, in order to make it conform to the uses intended by the parties. Although the complainant had no title to this property, he had it in possession, and we see no good reason, either in equity or good conscience, why he should have a specific delivery of it decreed to him. Code, §3188. Besides, we are not aware of any power possessed by a court of equity, or any other court, to compel a party to perform personal service for another, which he had contracted to perform, but was unwilling to render; this would reduce him to involuntary servitude, not as a punishment for crime, but for an alleged breach of contract, and would be directly in the teeth of the constitution. *Ex parte* Clark, 1 Blackford R., 122, which is fully in point. Apart from this constitutional inhibition, what power has a court of equity to enforce such a decree, especially against non-resident defendants, who are not restrained by any process from going beyond the limits of the state, or in any manner bound to remain within the jurisdiction of the court, to answer to any decree it may render? That complainant, in consequence of the failure of the defendants to perform this contract, might have filed his bill for its recission and the recovery of damages for its breach, admits of little doubt. Had he seen proper to take this course, he could have obtained a decree only

on equitable terms; he could not have repudiated the contract, and at the same time have retained possession of the property about which it was made.    When the defendants brought trover for the property they elected to abandon the contract; the complainant, however, did not fully assent to this, and enjoined their action; the only purpose for which this injunction could have been granted was to keep the property in *statu quo*, to answer whatever either party might recover on the final hearing of the suit.    The jury have adjusted the equities between them, and in doing so have largely reduced the defendants' claim; the decree does not dispossess the complainant of the property, but fixes the lien of the defendant on it, superior to all other liens outstanding against the complainant.    In the opinion of the court, this was the only purpose for which the suit could be maintained, and we think his view of it was correct.

3. The only remaining question is one of more difficulty than the others.    The complainant claimed damages for alleged losses sustained by abandoning his planting operations and going into the milling business, for improvements made in order to carry on that business, for alleged loss of property by reason of having got an outfit inferior to that for which he bargained, for additional purchases of timber, stock, vehicles, etc., to run a mill of the capacity of that for which he bargained, for personal services of himself and assistants while he was running it, at least until its capacity had been fully tested.    The court rejected proof of each of these items, as is shown in the first and second grounds of the motion for a new trial.    Such damages seemed, in the opinion of the court, to be only the imaginary or possible results of the conduct complained of, and to be caused by other and contingent circumstances largely preponderating, and were therefore too remote to be the basis of a recovery; that though contingent to some extent, they were not the legal and natural result of the acts of the defendants; that, though traceable to such acts,

they were not the legal or natural consequences of such acts, and were for that reason too remote and contingent. Code, §§3072, 3073. This ruling appears to be fully sustained by the authorities. " Remote or consequential damages are not allowed, unless they can be traced solely to the breach of the contract, or are capable of exact computation, such as the profits, which are the immediate fruit of the contract and are independent of any collateral enterprise entered into in contemplation of the contract." Code, §2944 and citations. The case sought to be made by this evidence is, it seems to us, within the very words of this section of the Code. In fact, the compilers of the Code embodied in this section the former rulings of this court, particularly in *Coweta Falls Manufacturing Company vs. Rogers*, 19 *Ga.*, 417; *Cooper vs. Young*, 22 *Ib.*, 269 ; *Red vs. The City Council of Augusta*, 25 *Ib.*, 386, 390.

The case of Masterton and another *vs.* The Mayor, etc., of Brooklyn, 7 Hill N. Y. R., 60, 67, 68, meets and settles every possible phase of the questions raised on the introduction of this testimony. The court, in giving the charge excepted to in the 7th and 13th grounds of the motion, made every deduction in favor of complainant to which he was entitled under the law ; in short, the entire charge sent up in the record is clear and able, just to the parties, and certainly leaves no room for complaint, especially on the part of the plaintiff in error. In the *Southwestern R. R. Co. vs. Rowan and another*, 43 *Ga.*, 411, 414, which was a suit for refusing to receive cross-ties under a contract to deliver them, it was said, " The general rule undoubtedly is, that the measure of damages in a contract like this is the difference between the agreed value and the market value of the thing contracted for, unless the article has no market value." Loder *vs.* Kerkulé, 3 C. B. (N. S.), 128, closely resembles the present case, and there it was held that, " in an action for the breach of a contract by delivering goods of a quality inferior to that contracted for, the proper measure of damages was the difference between

the value of the goods of the quality contracted for, at the time of the delivery, and the value of the goods then actually delivered, or their value, as ascertained by a re-sale within a reasonable time ; and the fact of the goods having been previously paid for cannot be taken into consideration in estimating the damages." See the cases cited in note at the end of this case, 91 E. C. L. R., 139. It is to be noticed that the complainant at no time returned, or offered to return, this machine, with its fittings, to the respondents, but continued to use it, with all of its alleged defects, for some months after he had completed the test to ascertain its quality. The judge—in charging the jury that if the machinery was not up to the contract in any respect, if it was defective in material, workmanship or capacity, and the complainant, in testing it, as he was authorized to do by the contract, incurred expense, damage or cost, they should first see what was the difference between its agreed value and its real value at the time of the delivery, or at the time the test was completed, and they would fix the market value as the amount to be recovered by the defendants, and then deduct from this amount any damage they might find for the complainant, and find for the defendants the balance with interest; or in the event that the amount of damages to which the complainant was entitled exceeded the market value of the machinery, they would find for him the amount of such excess, as well as the machinery—surely did not hurt the complainant. The rule as to damages here laid down was, we think, more favorable than could have been demanded, under the authorities we have examined. Had the defendants made objection, they would have been more favorably regarded, and entitled to much more consideration than those so confidently relied on here. We think this verdict supported by the evidence, and, as before stated, we see no error in this record prejudicial to the complainant's rights.

The defendants did not except, and there was no error in refusing to disturb the finding of the jury.

Judgment affirmed.